Wally BRUCHMAN and Geo. B. Zaloom & Co., Inc., Plaintiffs,

v.

STANDARD CHARTERED BANK, PLC, a public limited company, Defendant.

No. 95 CIV. 0022(PKL).

United States District Court, S.D. New York.

March 17, 1998.

 

Andrew L. Schlafly, New York, NY, for Plaintiffs.

Schiff Hardin & Waite, Chicago, IL (J. Mark Fisher, Stephen J. Bonebrake, of counsel), for Defendant.

## OPINION & ORDER

LEISURE, District Judge.

■ Geo. B. Zaloom & Co., Inc. ("Zaloom") and Wally Bruchman (together, "plaintiffs") bring this action against Standard Chartered Bank, PLC ("SCB"), for fraudulent concealment in connection with two commercial transactions. Zaloom also claims against SCB under U.C.C. § 4–103(5), for failure to pay certain documentary drafts in a timely manner. Pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, SCB moves for summary judgment on plaintiffs' claims. SCB also moves pursuant to Fed. R.Civ.P. 56(e) to strike the affidavits of four witnesses offered by plaintiffs in support of their claims. For the reasons stated herein, the Court grants in part and denies in part defendant's motion to strike, and grants defendant's motion for summary judgment.

## BACKGROUND

At all times relevant to this action, Zaloom was a New York corporation with its principal place of business in Secaucus, New Jersey. *See* Defendant's Statement of Uncontested Facts ("Def.'s 56.1") at ¶ 2. Zaloom's business principally involved importing and wholesaling handmade oriental rugs. *See id.* at ¶ 6. Raymond Nargizian served as president of Zaloom at all relevant times. During 1990, Bruchman served as Vice President of Sales and Marketing for Amiran Corporation, another oriental rug importer. At the time of the filing of the Complaint in this action, he principally was involved in importing and wholesaling handmade oriental rugs. *See id.* at ¶ 5.

SCB is a multinational bank, headquartered in London, England, with offices in New York City. *See id.* at ¶ 3. SCB's New Jersey Loan Production Office ("LPO") managed a number of accounts, including lines of credit for Zaloom and Parvizian, Inc. ("Parvi-

zian"). *See id.* at ¶ 9. Stephen Wahl, Richard Camisa, and Joseph Ferrise were Vice Presidents with SCB's New Jersey LPO. *See id.* at ¶¶ 7–8. In 1988, SCB adopted a written credit policy, entitled "Credit Policy USA" (the "1988 Policy"), which set forth SCB's lending criteria from 1988 until 1992. *See id.* at ¶ 16; *see also* Credit Policy USA, annexed as Exhibit 2 ("Ex.2") to the Appendix to Defendant's Motion for Summary Judgment ("Def.'s App."). The 1988 Policy was designed to encourage SCB to maximize profits and avoid losses by booking sound and constructive loans. *See* Ex. 2 at 1. The 1988 Policy stated that in order to meet this objective, SCB would devote its available resources primarily to international trade, though "we [SCB] shall not exclude for consideration any business which will assist in achieving our key objective." *Id.* The 1988 Policy did enumerate certain sectors that, absent overriding considerations, SCB sought to avoid. These were: real estate, leveraged buyouts, hostile acquisitions, shipping, airlines, and agriculture. *See id.* The oriental rug industry was not mentioned in the 1988 Policy as one of the business sectors to which SCB should avoid lending.

On August 25, 1988, Camisa submitted for approval by SCB's Area Credit Control a loan application for Zaloom to establish a line of credit with SCB. *See* Def.'s 56.1 at ¶ 18. Zaloom was a new customer for SCB. The loan application was approved on September 12, 1988, and SCB established a line of credit for Zaloom by letter agreement dated September 23, 1988 (the "Letter Agreement"). *See id.* at ¶¶ 19, 22; *see also* Loan Approval Form, annexed as Exhibit 1 to Def.'s App.; Letter Agreement dated September 23, 1988, annexed as Exhibit 3 ("Ex.3") to Def.'s App. The stated purpose of this credit facility was to finance Zaloom's purchase and import of oriental rugs. *See* Ex. 3 at 1. The Letter Agreement established an overall credit limit of $1.5 million, with a sub-limit of $250,000 for direct borrowing. *See id.* The Letter Agreement stated, "In accordance with our normal practice, this facility will expire August 31, 1989." *Id.* The 1988 Policy was in effect at the time that SCB and Zaloom entered into the Letter Agreement establish-

ing Zaloom's credit facility with SCB. *See* Def.'s 56.1 at ¶ 21.

Oundjian, Inc. ("OI") also was an importer of oriental rugs. *See* Deposition of Raymond Nargizian ("Nargizian Dep.") at 27, annexed as Exhibit J to Def.'s App. At the time that Zaloom and SCB entered into the Letter Agreement, SCB had credit facilities with a number of other companies engaged in the oriental rug business, including OI. *See* Affidavit of Stephen Wahl ("Wahl Aff.") at ¶ 4, annexed as Exhibit D to Def.'s App. At or around the time that SCB and Zaloom entered into the Letter Agreement, Wahl informed Nargizian that Haig Oundjian, who owned and ran OI, wished to divest himself of the assets of OI because he was in poor health. *See* Wahl Aff. at ¶ 7; *see also* Nargizian Dep. at 109–10. Nargizian and Oundjian then negotiated Zaloom's purchase of some of OI's inventory. In January of 1989, Zaloom decided to purchase approximately $500,000 of OI's assets. *See* Nargizian Dep. at 173. On January 17, 1989, SCB's New Jersey LPO submitted an application to increase Zaloom's direct borrowing capability under the Letter Agreement from $250,000 to $750,000, in order to finance Zaloom's planned purchase from OI. *See* Wahl Aff. at ¶ 8. The application was approved, and on May 8, 1989, OI and Geo. B. Zaloom & Co. of New Jersey, a new subsidiary formed by Nargizian, entered into an agreement pursuant to which Zaloom purchased certain assets from OI (the "Oundjian transaction"). *See* Purchase Agreement dated May 8, 1989, annexed as Exhibit 4 to Def.'s App.

On October 18, 1989, Camisa prepared an application to extend the credit facility established pursuant to the Letter Agreement. *See* 1989 Loan Renewal Application, annexed as Exhibit 5 to Def.'s App. On November 6, 1989, SCB's Area Credit Control approved the application, which stated that it "conforms to Credit Policy USA." *Id.* In an updated letter agreement, SCB renewed and expanded its lending to Zaloom, with Zaloom's overall credit limit increased by $500,-000 and its sub-limit for direct borrowing increased by $1.25 million. *See* Letter Agreement dated November 14, 1989, annexed as Exhibit 6 to Def.'s App. The letter

agreement of November 14, 1989, stated, "The credit facilities described herein will expire on October 31, 1990." *Id.*

On October 24, 1990, Camisa again prepared and submitted an application to renew Zaloom's credit facility. *See* 1990 Loan Renewal Application, annexed as Exhibit 7 to Def.'s App. Camisa proposed to renew the existing agreement without amendment. *See id.* at 5. However, Brian Taylor, a Credit Appraiser for SCB, recommended qualified approval of the application. In a memorandum dated October 30, 1990, Taylor noted that Zaloom was in an industry projected to decline, the company lacked cash flow, and its revenues and net profitability had reversed. *See* Annotated Loan Application Review, annexed as Exhibit 8 to Def.'s App. Therefore, Taylor concluded, "Approval [is] recommended on the understanding that an exit is being sought and we will be out by next year." *Id.* Paul Bridges, Head of Area Credit Management, agreed that SCB needed to implement an exit strategy. *See id.* Accordingly, SCB renewed Zaloom's credit facility subject to the requirements that Zaloom pay down its indebtedness to SCB and attempt to obtain alternative means of financing. *See* Wahl Aff. at ¶ 12. Unable to obtain alternative financing, Zaloom continued to borrow against its credit line with SCB until July of 1992. *See* Nargizian Dep. at 281–82.

Starting in 1989, Zaloom utilized its credit facility with SCB for, *inter alia,* the purchase of goods from suppliers in India and China. Suppliers would present a draft to SCB's New York Branch and demand payment. When Nargizian or another Zaloom employee confirmed the transaction and approved the requested payment, SCB would debit Zaloom's account and pay the draft. *See* Complaint at ¶ 26. According to an operations officer in SCB's trade services division, SCB processed, on average, fifteen to twenty documentary drafts per business day for its customers during the period from 1990 through 1993. *See* Affidavit of Lauro Clem-

ente at ¶ 3, annexed as Exhibit C to Def.'s App.

Between 1989 and 1993, SCB processed over 200 documentary drafts for Zaloom. *See* List of Documentary Drafts, annexed as Exhibit 10 ("Ex.10") to Def.'s App. In the Complaint, Zaloom identified eight drafts that it claims were not paid in a timely manner after Zaloom had authorized payment. *See* Complaint at ¶ 27. While the parties dispute the timeliness of payment, there is no dispute that SCB did pay these drafts. *See* Ex. 10 to Def.'s App.[1] Following an internal investigation, SCB acknowledged in April of 1991 that it had not paid a draft to Vandana International Exports ("Vandana") that had been authorized three months earlier (this is the third draft identified in paragraph 27 of the Complaint). SCB then paid Vandana in full, including interest. *See* Affidavit of Marc Chait at ¶ 12 ("Chait Aff."), annexed as Exhibit B to Def.'s App.

In the summer of 1990, a group entered into negotiations to purchase certain assets of Parvizian. Bruchman joined the group in forming Par–Inco, Inc. ("Par–Inco"), to effect the transaction. *See* Deposition of Wally Bruchman ("Bruchman Dep.") at 72, annexed as Exhibit G to Def.'s App. Bruchman is a 10% shareholder in Par–Inco. *See* Affidavit of Wally Bruchman at ¶ 1, annexed as Exhibit C to the Appendix to Plaintiffs' Opposition to Defendant's Motion for Summary Judgment ("Pl.'s App."). While Bruchman relied on his partners to work out the banking arrangements for the potential purchase, *see* Bruchman Dep. at 43, he claims that Wahl stated that SCB intended to provide continued financing to the successor-in-interest to Parvizian. *See* Bruchman Aff. at ¶ 4.

On August 8, 1990, Wahl sent a letter to Abdi Parvizian, the president of Parvizian, in which Wahl stated that SCB wished "to formally express our interest in providing financing for the new entity" that would succeed Parvizian. *See* Wahl Letter dated August 8, 1990, annexed to Bruchman Aff. Wahl added, "[T]his is a letter of interest

---

**1.** Zaloom does not admit that SCB paid the second draft cited in paragraph 27 of the Complaint. However, the record clearly indicates that SCB's Shanghai Branch had purchased the associated

receivable from Zaloom's supplier. *See* Internal SCB Memorandum, dated August 24, 1990, annexed as Exhibit 22 to Def.'s App. Therefore, SCB paid the supplier.

based on information currently available to the Bank. It is not a commitment to lend nor in any way to be interpreted as a formal offer to extend credit ...." *Id.* On October 4, Ferrise followed up with another letter to Abdi Parvizian, stating:

> I am writing this letter to you as an indication of the interest Standard Chartered Bank has in providing the working capital financing requirements for the newly formed Par–Inco, Inc., the successor to Parvizian Inc. of New York.
>
> We envision a financing proposal very similar to our existing commitment ... to Parvizian, Inc. in terms of the amount, formula borrowing base, and the continuing guarantees of the principals. In addition, the Bank would require the additional personal guarantee of John Ansari and corporate guarantee of B. Ansari.
>
> Furthermore, the Bank would require sufficient details of the purchase agreement for us to adequately appraise the transaction....
>
> Please understand this letter is not a commitment, a contract, or an offer to enter into a contract and should not be deemed to obligate the Bank in any manner whatsoever. Our consideration for your financing request is subject to a credit approval and the satisfactory negotiations of a loan agreement with terms and conditions satisfactory to the Bank, which may not be limited to those requirements mentioned above.

Ferrise Letter dated October 4, 1990 (the "Ferrise Letter"), annexed as Exhibit 11 to Def.'s App.

At his deposition, Bruchman stated, "I think I read this letter just before the closing, as I recall. In other words, we received the letter, we read it....[j]ust before we signed." Bruchman Dep. at 58. He added, "We were waiting for this letter, we got this letter and then basically we went in and did the closing." *Id.* at 59. The parties closed on the transaction transferring certain Parvizian assets to Par–Inco ("the Par–Inco transaction") immediately after receiving, and reading, the Ferrise Letter. *See* Deposition of Abdi Parvizian at 147–149, annexed as Exhibit K to Def.'s App; *see also* Par–Inco

Purchase Agreement, annexed as Exhibit 13 to Def.'s App.

In an internal memorandum to SCB Area Credit Management dated November 9, 1990, Wahl noted, "Our revised North American credit policy necessitates the formulation of an exit strategy for the oriental rug industry, which no longer qualifies for financing." Memorandum dated November 9, 1990 ("Wahl Memo"), annexed as Exhibit 36 to Wahl Dep. Wahl explained that the then-ongoing economic recession had led to a slowdown both in sales of oriental rugs by wholesalers such as Zaloom and in wholesalers' collection of receivables from oriental rug retailers. *See id.* Wahl went on to detail a strategy pursuant to which SCB would discontinue its lending to businesses in the oriental rug industry, including Zaloom and Par–Inco. *See id.* On December 6, 1990, Ferrise wrote to Abdi Parvizian informing him that SCB had declined to renew Parvizian's $3.8 million line of credit and requesting that Parvizian develop a plan to pay down its obligations to SCB. *See* Letter dated December 6, 1990, annexed as Exhibit 16 to Def.'s App. On April 18, 1991, SCB and Par–Inco entered into a loan agreement whereby Par–Inco assumed $1.35 million of Parvizian's outstanding debt to SCB and gained access to $1.85 million in credit from SCB. *See* Loan and Security Agreement at 2, 12, annexed as Exhibit 17 to Def.'s App.

On January 3, 1995, plaintiffs filed their Complaint in this Court, alleging that defendant is liable for fraudulent concealment and for violations of U.C.C. § 4–103. As there exists diversity of citizenship and the amount-in-controversy requirement is satisfied, jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1332. Defendant has moved for summary judgment on plaintiffs' claims, and also has moved to strike certain affidavits offered by plaintiffs in support of their claims.

## DISCUSSION

I. *Motion to Strike*

A. *Applicable Standard*

As Rule 56(e) of the Federal Rules of Civil Procedure mandates, "Supporting and oppos-

ing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R.Civ.P. 56(e). The Court of Appeals for the Second Circuit has made it clear that affidavits relating to a motion for summary judgment must be based on personal knowledge, and that a hearsay affidavit is not a substitute for the personal knowledge of a party. *See Sellers v. M .C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir.1988).

### B. *The Challenged Affidavits*

#### 1. *Lawrence Tadross's Affidavit*

Defendant moves the Court to strike the affidavit of Lawrence Tadross, or in the alternative to strike certain selections therefrom. Defendant's motion to strike Tadross's affidavit in its entirety must be denied. The affidavit recites that it is sworn and based upon personal knowledge. Tadross's status as an employee first of OI and later of Zaloom, as well as his friendship with Wahl, provides an adequate foundation for the affidavit as a whole and renders him competent to testify as to many of the matters at issue in this action. While defendant alleges that the circumstances surrounding the preparation of Tadross's affidavit render it unreliable, these allegations simply create an issue of credibility that a trier of fact could consider in deciding what significance, if any, should be attributed to the affidavit. The allegations thus are insufficient to support defendant's motion to strike the affidavit in its entirety.

■ The Court, however, grants defendant's motion in the alternative to strike paragraph seven of Tadross's affidavit, because there is no evidence that the statements in paragraph seven are based upon the affiant's personal knowledge. In paragraph seven of his affidavit, Tadross stated:

Zaloom was told that Haig Oundjian needed to sell his assets because of his poor health; in fact, he was not in poor health at all. Moreover, Wahl was fully aware that the accounting books of Oundjian in New York did not properly reflect the

actual value of its business assets, due to the commingling of funds with Oundjian affiliates in foreign countries. But Wahl clearly wanted and needed to induce Zaloom to acquire assets of Oundjian so that it could pay back its loan to SCB. It was my understanding that SCB was planning to exit the industry, but had not informed Zaloom of its plans. Nor was Zaloom aware of the dire financial condition of the New York operation of Oundjian.

Affidavit of Lawrence Tadross ("Tadross Aff.") at ¶ 7, annexed as Exhibit D to Pl.'s App.

Tadross did not state how he came to possess personal knowledge of SCB's strategic plans, Wahl's "needs," Zaloom's knowledge, OI's financial condition, nor even Haig Oundjian's health. Tadross did state in paragraph five of his affidavit that he and Wahl had participated in "informal meetings" in which Wahl expressed concern to Tadross, an OI employee, about OI's paying the balance of its loan to SCB. Tadross Aff. at ¶ 5. However, there is nothing in the affidavit linking these conversations to the statements in paragraph seven. The Court will not speculate as to how Tadross might have had personal knowledge of the issues he discussed in paragraph seven, because under Rule 56(e) the affiant must demonstrate affirmatively personal knowledge. As Tadross did not demonstrate that his statements in paragraph seven were made with personal knowledge, the Court grants defendant's motion to strike paragraph seven.

#### 2. *Nargizian Affidavit*

■ Defendant also moves to strike those statements in the eighth paragraph of Nargizian's affidavit that relate to the timeliness of SCB's payment of documentary drafts. The Court strikes the following statement from the affidavit, as it is based solely on inadmissible hearsay: "About once per month, however, SCB would unreasonably delay its forwarding of payment to the foreign suppliers until long after SCB debited Zaloom's account." Affidavit of Raymond Nargizian sworn January 24, 1997, at ¶ 8 (the "First Nargizian Affidavit"), annexed as Exhibit B to Pl.'s App. In a subsequent affidavit, Nargi-

zian clarified that conversations with his suppliers served as the source of his knowledge about SCB's alleged delayed payments. *See* Affidavit of Raymond Nargizian sworn March 11, 1997, at ¶ 5, annexed as Exhibit B to Plaintiffs' Memorandum in Opposition to Defendant's Motion to Strike. Nargizian thus admits that his statement in paragraph eight of the First Nargizian Affidavit was based solely on inadmissible hearsay; he testified as to what his suppliers told him for the purpose of demonstrating that what they told him (*i.e.,* that SCB did not timely pay documentary drafts) was true. Therefore, this statement does not satisfy the evidentiary requirements of Rule 56(e) because it is not based on personal knowledge. *See Sellers,* 842 F.2d at 642. The Court thus grants defendant's motion to strike the disputed statement.

### 3. *Kapoor and Vandana Affidavits*

■ Finally, defendant moves to strike in their entireties or in part the affidavits of Vimal Kapoor and Surminder Anand, two of Zaloom's suppliers. Defendant's motion to strike the affidavits in their entireties is frivolous. Defendant asserts that the affidavits are unreliable because they are similar in language and content, both were executed in New Jersey (while both affiants are from India), and because defendant has difficulty ascertaining the affiants' names as written on the first pages of their respective affidavits. The Court finds that none of these contentions supports a conclusion that the affidavits are impermissibly unreliable; defendant's attempt to strike the affidavits on these grounds is devoid of merit.

■ Defendant moves in the alternative to strike both affiants' statements that their companies did not receive payments from SCB in a timely manner. *See* Affidavit of Vimal Kapoor at ¶ 3, annexed as Exhibit E to Pl.'s App.; Affidavit of Surminder Anand at ¶ 3, annexed as Exhibit F to Pl.'s App. Defendant asserts that these statements are conclusory and lack the requisite specificity because they do not cite specific instances of untimely payment. The Court will not strike the statements merely because they are not so specific as defendant would desire. Nor

does the Court find that the disputed statements are conclusory. Rather, both affiants offer sworn testimony that SCB "repeatedly" and "on numerous occasions" failed to pay documentary drafts in a timely manner. Their contentions are based on personal knowledge and are relevant to Zaloom's claim under U.C.C. § 4–103. As defendant has not offered any valid reason to strike this testimony from Kapoor and Anand, the motion is denied.

### II. *Defendant's Motion for Summary Judgment*

### A. *The Applicable Standard*

The moving party is entitled to summary judgment only if the Court determines that there exists no genuine issue of material fact and that based on the undisputed facts, the moving party is entitled to a judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *see also Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 128 (2d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 1819, 137 L.Ed.2d 1027 (1997); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995) (citing *Celotex,* 477 U.S. at 322–23); *see also Scottish Air Int'l, Inc. v. British Caledonian Group, PLC,* 81 F.3d 1224, 1231 (2d Cir.1996). The Court's function on a motion for summary judgment is not to try issues of fact, but rather to determine whether there exists a genuine issue of material fact to be tried. *See Sutera v. Schering Corp.,* 73 F.3d 13, 15–16 (2d Cir.1995). In determining whether there exists a genuine issue of material fact, the Court must resolve all ambiguities and draw all justifiable inferences in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91

L.Ed.2d 202 (1986); *see also Holt,* 95 F.3d at 129.

### B. *Fraudulent Concealment Claims*

▮ Plaintiffs claim against defendant for fraudulent concealment. To prove common law fraud under New York law, a plaintiff must show that (1) the defendant made a material false representation, with knowledge of its falsity; (2) the defendant intended to defraud the plaintiff; (3) the plaintiff reasonably relied upon the representation; and (4) the plaintiff suffered damage as a result of this reliance. *See Banque Arabe et Internationale v. Maryland Nat. Bank,* 57 F.3d 146, 153 (2d Cir.1995); *see also Kregos v. Associated Press,* 3 F.3d 656, 665 (2d Cir. 1993). To prove fraudulent concealment, a plaintiff also must establish that the defendant had a duty to disclose the material information. *See Banque Arabe,* 57 F.3d at 153. Under New York law, each element of a fraud claim must be proven by clear and convincing evidence. *See id.*

### 1. *The Oundjian Transaction*

▮ Zaloom contends that SCB had a duty to disclose that the 1988 Policy mandated that SCB cease lending to the oriental rug industry, that SCB failed to disclose this lending policy prior to financing Zaloom's purchase of certain of OI's assets, and that Zaloom relied on the lack of such a policy in entering into the Oundjian transaction. *See* Complaint at ¶¶ 34–36. Defendant moves for summary judgment on the grounds that the 1988 Policy did not prohibit lending to the oriental rug industry. Defendant also claims that any reliance by Zaloom on an implied promise to continue financing its inventory purchases was unreasonable as a matter of law.

Plaintiff offers no admissible evidence upon which a reasonable juror could conclude that the 1988 Policy banned further lending to the oriental rug industry. On its face, the 1988 Policy contains no such prohibition. *See* Ex. 2 to Def.'s App. Moreover, the 1988 Policy was in effect when SCB and Zaloom first agreed to establish a credit facility for Zaloom at SCB. *See, supra,* at 4. Finally, defendant offers the testimony of a number of its employees, all of whom deny the existence of any such prohibition. *See, e.g.,* Wahl Aff. at ¶ 10 ("During 1989, neither the 1988 Policy nor any other policy precluded lending to members of the oriental rug industry."); Deposition of Paul Bridges at 197, annexed as Exhibit F to Def.'s App.; Chait Aff. at ¶ 4 ("No such policy was ever in effect.")

While the Court must reserve any genuine issue of material fact for a jury, Zaloom offers no admissible evidence that would create a genuine fact issue. The only admissible evidence Zaloom offers in support of its position is the Wahl Memo, which begins, "Our revised North American credit policy necessitates the formulation of an exit strategy for the oriental rug industry, which no longer qualifies for financing." Wahl Memo. Wahl then explains that SCB must cease lending to businesses in the oriental rug industry due to changes in market conditions occurring since the second half of 1989. In short, the memorandum shows only that SCB had decided by late 1990 that, due to changes in the relevant market over the previous fifteen months, continued lending to the oriental rug industry would violate the principles set forth in the 1988 Policy. The document as a whole cannot support a reasonable conclusion that the 1988 Policy itself prohibited loans to the oriental rug industry, nor that any such prohibition existed when Zaloom entered into the Oundjian transaction in May of 1989.

The Court concludes based on the evidence presented by defendant, and the lack of evidence from Zaloom, that no reasonable juror could conclude that, in May of 1989, SCB had enacted a policy against extending credit to businesses in the oriental rug industry. As defendant offers uncontradicted evidence demonstrating that there was no SCB policy against lending to the oriental rug industry as of May of 1989, Zaloom cannot establish one of the essential elements of its fraudulent concealment claim: a material false representation. Accordingly, the Court must grant defendant's motion for summary judgment as to Zaloom's claim for fraudulent concealment in connection with the Oundjian transaction.

Even if Zaloom could establish that there exists a genuine issue of fact with regard to the existence of such a policy, Zaloom's claim

would fail because it cannot demonstrate reasonable reliance. To succeed on its claim, Zaloom also must show that it reasonably relied on the belief that SCB would extend Zaloom credit for an extended period of time. However, any such belief would have been unreasonable in light of the clear and unambiguous language of the Letter Agreement, which plainly stated that Zaloom's credit facility at SCB would expire on August 31, 1989. *See* Ex. 3 to Def.'s App.[2] Thus, even if SCB had concealed that it would not continue lending to the oriental rug industry, the plain language of the Letter Agreement dictates that as of May of 1989, Zaloom could not reasonably have believed that SCB was committed to extending Zaloom's credit facility beyond August 31, 1989. Plaintiff's inability to prove reasonable reliance provides an alternative basis for the Court's decision to grant summary judgment on Zaloom's claim for fraudulent concealment in connection with the Oundjian transaction.

### 2. *The Par–Inco Transaction*

■ Bruchman also claims against SCB for fraudulent concealment, in connection with the Par–Inco transaction. Bruchman alleges that SCB concealed in the fall of 1990 that it had a policy against lending to the oriental rug industry, and that in entering into the Par–Inco transaction, Bruchman relied on the belief that there was no such policy. *See* Complaint at ¶¶ 37–39.

Defendant is entitled to summary judgment on this claim as well, because Bruchman cannot demonstrate reasonable reliance. In light of the Ferrise Letter, Bruchman could not reasonably have relied in entering into the Par–Inco transaction on SCB's extending Par–Inco credit. It is hard to imagine how SCB could have stated more explicitly than it did in the Ferrise Letter that SCB was not committed to extending Par–Inco credit. *See, supra,* at 486. Bruchman admits to having read the Ferrise Letter immediately prior to closing the Par–Inco transaction. *See, supra,* at 486. Therefore, he cannot claim that in consummating the deal he reasonably relied on SCB's extending credit to Par–Inco. Accordingly, it is imma-

terial whether SCB had a policy prohibiting future loans to the oriental rug industry. As Bruchman cannot prove reasonable reliance, SCB is entitled to summary judgment on the claim that it engaged in fraudulent concealment in connection with the Par–Inco transaction.

### C. *Documentary Drafts*

In the Complaint, Zaloom cites eight instances in which it claims that SCB failed to pay authorized documentary drafts in a timely manner. *See* Complaint at ¶ 27. In connection with these alleged failures, Zaloom asserts a claim under U.C.C. § 4–103(5), which provides:

> The measure of damages for failure to exercise ordinary care in handling an item is the amount of the item reduced by an amount which could not have been realized by the use of ordinary care, and where there is bad faith it includes other damages, if any, suffered by the party as a proximate consequence.

N.Y. U.C.C. § 4–103(5) (McKinney 1991 and Supp.1997–98). Defendant moves for summary judgment on this claim as well.

### 1. *Timeliness*

■ The Court finds that Zaloom's claim was timely filed as to all eight drafts. The Complaint in the instant action was filed on January 3, 1995, and the earliest of the drafts on which Zaloom bases its claim was dated November 4, 1989. *See id.* CPLR § 214(2) prescribes a three-year statute of limitation for "an action to recover upon a liability, penalty or forfeiture created or imposed by statute except as provided by [CPLR] sections 213 and 215." N.Y. Civ. Prac. L. & R., § 214(2) (McKinney 1991 and Supp.1997–98). CPLR § 213(2) provides a six-year limitations period for "an action upon a contractual obligation, express or implied . . . ." N.Y. Civ. Prac. L. & R., § 213(2) (McKinney 1991 and Supp.1997–98). The New York Court of Appeals has explained:

> [W]e have consistently held that [CPLR § 214], like its predecessor, only governs

---

**2.** The letter agreement of November 14, 1990, which extended the credit facility, similarly stated that it would expire on October 31, 1990. *See* Ex. 6 to Def.'s App.

liabilities which would not exist but for a statute. It does not apply to liabilities existing at common law which have been recognized or implemented by statute. Thus, if the [statute imposing liability] merely codifies or implements an existing liability, the three-year statute would be inapplicable.

*Aetna Life & Casualty Co. v. Nelson,* 67 N.Y.2d 169, 501 N.Y.S.2d 313, 315, 492 N.E.2d 386 (1986) (internal citations omitted).

Zaloom's claim under U.C.C. § 4–103(5) clearly constitutes an action to recover upon a statutory liability. However, prior to the enactment of U.C.C. § 4–103(5), a plaintiff could have recovered in a common law cause of action based on the allegations set forth in the Complaint. Section 4–103(5) merely codified an existing liability, as explained in the New York Annotations to the statute:

> The first part of the subsection appears to be generally in accord with decisional law. *Allen v. Suydam & Boyd,* 20 Wend. 321 (1838); *First National Bank v. Fourth Nat'l Bank,* 77 N.Y. 320 (1879); *Mogul, Inc. v. Lavine, Inc.,* 247 N.Y. 20, 159 N.E. 708 (1928). The last part of the subsection is supported by a dictum in an early New York decision. *Ayrault v. Pacific Bank,* 6 Rob. 337, aff'd. 47 N.Y. 570 (1872).

New York Annotations to N.Y. U.C.C. § 4–103(5) (McKinney 1991 and Supp.1997–98). As the liability at issue in this claim would have existed even if § 4–103(5) had not been enacted, the Court follows *Aetna* and finds that the six-year statute of limitations under CPLR § 213(2), rather than the three year period under CPLR § 214, applies to Zaloom's claims under U.C.C. § 4–103(5). Therefore, Zaloom's claim is timely filed as to all eight drafts identified in the Complaint.

### 2. *Bad Faith*

Under U.C.C. § 4–103(5), the measure of damages for failure to exercise ordinary care in handling an item is the amount of the item. However, if a plaintiff demonstrates bad faith, it also can recover consequential damages. In the instant case, SCB eventually paid all the documentary drafts at issue. *See, supra,* at 485. Thus, Zaloom

only can recover if it can demonstrate that SCB's alleged failure to pay the drafts in a timely manner was in bad faith.

Under the U.C.C., good faith is defined as honesty in fact in the conduct or transaction concerned. *See* N.Y. U.C.C. § 1–201(19) (McKinney 1991 and Supp.1997–98). Defendant denies that it failed to pay any of the disputed drafts in a timely manner. However, defendant asserts that, even assuming that it failed to exercise ordinary care in paying the drafts, there is no evidence supporting an inference that it acted in bad faith. In support of its contention that it acted in good faith, SCB points to the low percentage of Zaloom's documentary drafts that are at issue here (only 8 of over 200, or less than 4% over four years) and the relatively large number of drafts that it handled during the relevant period (15–20 per day). *See, supra,* at 485. SCB also notes that when it discovered in April of 1991 that it had failed to pay a draft to Vandana that had been authorized three months earlier, SCB admitted its error and fully reimbursed Vandana, with interest. *See, supra,* at 485.

At this late stage of the proceedings, Zaloom presents no evidence to support its allegation that SCB acted in bad faith in failing to pay in a timely manner the eight authorized drafts identified in the Complaint. Rather, Zaloom asserts only that the Court must preserve the issue of SCB's bad faith for a trier of fact. However, this misguided view misses entirely the intended purpose of Rule 56: to weed out claims that, after the opportunity for full discovery, remain wholly unsubstantiated. As the Supreme Court explained in *Celotex,* summary judgment

> is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action.

477 U.S. at 327. In the instant case, defendant has presented evidence supporting its position that it acted in good faith. To avoid summary judgment, plaintiff must not rest on the conclusory allegations, speculation, and conjecture of its Complaint. Instead, Zaloom must set forth specific facts from

affidavits, depositions, answers to interrogatories, or admissions, showing that a genuine issue of fact exists for trial. *See Cifarelli v. Village of Babylon,* 93 F.3d 47, 51 (2d Cir. 1996). Zaloom has failed to present any such evidence. Therefore, the Court grants summary judgment on the grounds that there exists no genuine issue of material fact with regard to defendant's alleged bad faith in failing to pay certain documentary drafts in a timely manner. *See id.; see also Davidson v. Scully,* 114 F.3d 12 (2d Cir.1997) (upholding summary judgment where defendants demonstrated good faith as a matter of law).

## CONCLUSION

For the reasons stated in this Opinion, defendant's motion to strike is HEREBY GRANTED in part and DENIED in part. Defendant's motion for summary judgment is HEREBY GRANTED.

**SO ORDERED.**